**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

                  Plaintiff,

v.                                   CRIMINAL ACTION NO. 2:14-cr-00053

DAVID FRIZZELL,

                  Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant David Frizzell's motion to suppress [ECF 21].   For the reasons that follow, the Court **DENIES** the motion.

### I.        PROCEDURAL AND FACTUAL BACKGROUND

Defendant is charged in a single-count indictment with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. § 846.   Defendant moves to suppress oral statements he had made to law enforcement officers, as well as evidence seized from his vehicle, after the police stopped Defendant's van for a speeding violation.   On July 8, 2014, the Court conducted an evidentiary hearing on Defendant's motion.   Having considered the evidence presented and the arguments of counsel at the suppression hearing, this matter is now ripe for adjudication.

The following facts were adduced during the suppression hearing and, except as noted below, are not seriously in dispute:

On the morning of October 7, 2011, Defendant was driving a Ford van with temporary Ohio license plates.  Defendant was heading southbound on Interstate 79 ("I-79"), just north of the intersection of I-79 and Interstate-64 ("I-64") near Charleston, West Virginia.  Undercover police officer David Richardson was also driving on that same stretch of highway that morning and observed Defendant's van traveling at a high rate of speed.   Detective Richardson is a member of the Nitro, West Virginia police department and is a member of the area's drug task force, the Metropolitan Drug Enforcement Network Team ("MDENT").   Richardson proceeded to "pace" Defendant's speed, that is, he traveled behind Defendant's vehicle at the same speed and used his own speedometer to assess the speed at which Defendant was driving.[1]   Richardson continued to follow Defendant as he headed west on I-64.   At some point, Detective Richardson determined that Defendant was traveling at 76 miles per hour.[2]   Richardson, who was driving an unmarked car, then radioed Officer Daniel Johnson, who was a uniformed police officer and worked part-time for MDENT, for assistance.   Richardson advised Johnson that Defendant was speeding and directed him to stop Defendant's van.

---

[1] Defendant argues that the real reason why he was pulled over was because law enforcement suspected he was engaged in drug trafficking.   Defense counsel strenuously cross-examined Detective Richardson and Officer Johnson regarding their motives in making the traffic stop.   As discussed below (and conceded by counsel at the July 8, 2014, pre-trial motions hearing), where there is probable cause to make the traffic stop, the subjective motivations of the police officers are not relevant to the Fourth Amendment analysis.   The Court also observes that during Defendant's testimony at the suppression hearing, Defendant never denied he was speeding nor did his counsel query him on this salient point.   Thus, the Court credits the officers' testimony that Defendant was in fact speeding.

[2]   There was some conflict in the evidence concerning whether Defendant was driving in a construction zone at the time.   Detective Richardson claimed there was a construction zone, but defense counsel suggested (but offered no evidence) there was no construction zone at that point on the highway.   The issue is of no consequence because, even if defense counsel's view is correct, the normal posted speed limit for that section of highway with no construction zone would have been 60 miles per hour, according to Detective Richardson's testimony.   Thus, either way, Defendant was speeding.

2

At approximately 8:40 a.m., Officer Johnson identified Defendant's van traveling on I-64 westbound in "the fast lane."   Officer Johnson turned on his siren and lights and pulled Defendant over somewhere in between the interstate exits at Institute and Cross Lanes, West Virginia. Defendant pulled his van over onto the side of the highway, and Officer Johnson pulled in behind. Officer Johnson, who was in uniform, immediately got out of his car and approached the passenger side of the van, as was his customary practice when making traffic stops.   Defendant's wife was seated in the front passenger seat.   Officer Johnson asked Defendant for his driver's license, registration, and proof of automobile insurance.   Defendant complied.   Johnson asked Defendant to get out of the car, as was his usual practice when making traffic stops, and the two men then walked on the highway berm toward the rear of the van and the front passenger's side of Johnson's police car.   Defendant appeared very nervous and his nervousness did not subside during the stop, a fact that Johnson believed to be not typical of the motorists he stops for traffic violations.

At this point the parties' evidence sharply conflicts.   Officer Johnson testified that after he and Defendant reached the area in between the two vehicles, Johnson returned to his vehicle to run a check on Defendant's license and registration.   After running the check, Johnson learned that Defendant's Florida license was suspended.   He then walked over to the van, spoke with Defendant's wife, obtained her driver's license, ran a computer check on her license, and learned that her license was valid.   Johnson then returned to Defendant and finished filling out the speeding citation.

Within the first five minutes of the traffic stop, a second officer, Detective Petty, arrived on the scene.   Detective Petty spoke with Defendant's wife, who was still seated in the front passenger seat of the van.   Petty then informed Officer Johnson that, in addition to Defendant's

wife, there was another passenger, a male, who was lying down on a seat in the rear of the van. Officer Johnson radioed for additional backup and asked Defendant who was in the van. Defendant responded that his wife Tina, and three male passengers, Scotty, Danny, and "Boo" were in the van.   Defendant advised that he did not know Boo's real name.   Approximately six or seven minutes after Johnson requested backup, a third officer, Officer Ferry, a uniformed patrolman of the South Charleston Police Department, arrived.

Either before or after Officer Johnson ran the background check on Defendant, Johnson asked Defendant several questions.[3]   These questions concerned where Defendant was traveling from and to, what he was doing in South Charleston, and why Defendant had a Florida license. According to Johnson, these questions were brief and did not lengthen the traffic stop.

Once Officer Johnson finished running the license checks on Defendant and his wife and had written up a warning citation for speeding, he handed Defendant his license, registration, insurance card, and the warning citation.   Johnson then advised Defendant he was free to go. Johnson was not sure whether Officer Ferry arrived before or after he had given Defendant the citation and released him from the stop.   Johnson also did not have a specific recollection of the total length of this particular traffic stop, noting that it occurred several years ago and that he has since conducted numerous traffic stops.   Johnson estimated, however, that the length of the stop––that is, from the time Johnson first pulled Defendant's van over to the time he handed Defendant the warning citation and told him he could leave—would have been approximately fifteen minutes, based on the types of actions he took during this stop.

---

3  Johnson testified that he could not recall definitively when he asked these questions because the stop happened almost three years ago.   Although he could not remember this particular instance, typically Johnson asks these types of questions after he has run a license check and as he is writing out the citation.

According to Johnson, after he told Defendant he was free to leave, Defendant turned and walked toward his van.   As Defendant was walking away, Johnson then asked Defendant if he could ask him another question.   Defendant turned, agreed, walked back toward Johnson and the two men engaged in conversation.   Johnson asked Defendant if he had anything illegal in the van and inquired about specific prescription drugs.   Defendant replied that he had ibuprofen, but denied having any of the prescription drugs Johnson named.   Johnson then asked if Defendant would consent to a search of the van.   Defendant verbally agreed to let Johnson search the van and thereafter executed a written consent to search form.   At that point, the officers instructed the passengers to get out of the van so that the officers could search the vehicle.[4]   The officers' search resulted in the seizure of oxycodone, Xanax, and Lortab pills, $500 in cash, a GPS device, and cell phones.

Following the officers' testimony at the suppression hearing, Defendant testified.   His testimony conflicted in several significant respects with that of Officer Johnson.   Defendant admitted that Officer Johnson immediately got out of his car once he had pulled Defendant over, walked over to the van, and asked Defendant for his license, registration, and insurance information.   Defendant gave these items to Johnson, got out of the van at Johnson's direction, and walked with Johnson toward the back of the van.   In contrast to Officer Johnson's testimony, however, once Defendant and Johnson reached the area near the back of the van, Johnson launched into a series of questions concerning whether there were any drugs or guns in the van, who else was in the van, where he had come from, where he was going, what he was doing in South

---

[4]   At this time, Officer Johnson was assisted by Officers Petty and Ferry.   According to Defendant's testimony, a fourth officer, Detective Hackney, arrived on the scene during the search of the van.

Charleston, whether he came to the area frequently, and why he had a Florida license.   Defendant stated that Johnson asked all these questions before returning to his police car to run his license and registration check.   According to Defendant, these questions lasted five to ten minutes, and Johnson did not begin the license check until a second officer, presumably Petty, arrived.   This second officer arrived about ten to fifteen minutes after the stop was first made.

Defendant told Johnson the number and names of the occupants in the van.   Apparently, the view of the rear of the van was not visible from the front seat area, and, thus, Johnson did not see the three men in the back when he stood at the front passenger door and spoke with Defendant's wife.   About five to ten minutes after the second officer arrived, a third officer appeared on the scene, presumably Ferry.   Defendant testified that at the time Johnson asked him for his consent to search the van, he did not feel like he was free to leave or that he was free to refuse to give consent.   He stated that one of the officers was nice, but the other two were "pretty aggressive."   Defendant stated that the whole incident was overwhelming.

On cross-examination, Defendant admitted that after he was issued the citation, Johnson told him he was free to leave.   Defendant stated that after Johnson handed Defendant his paperwork Johnson immediately asked if he could ask him another question.   In some contrast to Johnson's testimony, Defendant maintained there was no delay.   Defendant did not deny that he had read and signed the written consent to search form and that he initialed several lines on the form that advised him that he had the right to refuse consent and the right to revoke his consent at any time during the search.   Significantly, Defendant estimated that the length of the time it took Johnson to give him a citation—-that is, from the time he first pulled the van off the road to the time he was told he was free to go—was at least a half hour.

### III.    LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The "[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

The mandate of the Fourth Amendment requires adherence to judicial processes and only in certain well-delineated circumstances do exemptions lie. *United States v. Jeffers*, 342 U.S. 48, 51 (1951). The burden is on those seeking the exemption to show the need for it. *Id.* (citing *McDonald v. United States*, 335 U.S. 451, 456 (1948)). In responding to a defendant's motion to suppress, the Government bears the burden of establishing by a preponderance of the evidence that it obtained valid consent to search. *United States v. Buckner*, 473 F.3d 551, 553–54 (4th Cir. 2007) (citing *United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978)).

### IV.    DISCUSSION

In his motion to suppress, Defendant makes three separate challenges. First he contends that Officer Johnson's initial stop of Defendant's vehicle was unlawful and, thus, all evidence must be suppressed. Second, assuming the legality of the initial stop, Defendant contends that the traffic stop was constitutionally unreasonable in both scope and duration. Lastly, Defendant argues that his verbal and written consent was not voluntarily given. The Court will address each contention in turn.

#### A.    *Legality of the Initial Stop*

Defendant's half-hearted challenge to the legality of the initial stop is meritless. It is

well-settled that "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

Detective Richardson testified that he observed Defendant speeding on the interstate highways in and near Charleston.  Richardson, who was not in uniform and was driving an unmarked car, radioed this information to Officer Johnson so that Johnson could conduct the traffic stop and issue the citation.   As such, both Detective Richardson and Officer Johnson each had probable cause to conduct the traffic stop.   It is elemental that probable cause exists where the officer has reasonably trustworthy information sufficient to warrant a prudent person in believing that a subject had committed or was committing an offense.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964). As noted recently by the Fourth Circuit, "this principle holds true even for the most basic traffic offense." *United States v. Williams*, 740 F.3d  308, 313 (4th Cir. 2014) (citations omitted). Defendant offers no authority for the proposition that this rather commonplace police practice is illegal or is otherwise improper in any way.   To the extent that Detective Richardson, Officer Johnson, or any other officer had suspicions that the occupants of Defendant's van might be engaged in criminal activity is simply irrelevant.  *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) ("Any ulterior motive a police officer may have for making the traffic stop is irrelevant.") (citing *Whren v. United States*, 517 U.S. 806, 813 (1996) and *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively)).

8

It is unclear whether Defendant's argument explicitly encompasses the contention that Detective Richardson's testimony that he observed Defendant speeding is false.  The Court rejects any such contention because Detective Richardson's testimony on this issue was forthright, clear, and credible.  The Court notes also that at no point during Defendant's testimony did he deny that he was speeding.  Accordingly, the Court finds that Officer Johnson had probable cause to make the stop.

B.      *The Traffic Stop was Constitutionally Reasonable in Both Scope and Duration*

A traffic stop typically begins when a car "is pulled over for investigation of a traffic violation[,]" *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), and typically ends when the police officer has "no further need to control the scene, and inform[s] the driver and passengers they are free to leave." *Id.*  Because traffic stops are more analogous to investigative detentions than custodial arrests, traffic stops, whether based on probable cause or reasonable suspicion, are analyzed under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968);  *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).  The propriety of a traffic stop is a two-pronged inquired under *Terry*:  First, a court must analyze whether the police officer's action was justified at its inception.  *Rusher*, 966 F.2d at 875.  Second, a court must examine whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop.  *Id*.

In this case, the Court has found that Officer Johnson had probable cause to stop Defendant's vehicle and that this initial stop was justified.  Thus, *Terry's* first prong has been satisfied and the Court's analysis is limited to an examination of *Terry*'s second prong.

"To satisfy *Terry*'s second prong, the traffic stop must be reasonable in both scope and

duration."   *United States v. Mohammed*, 13-4492, 2014 WL 2120235 *2 (4th Cir. May 22, 2014) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).   A traffic stop is appropriately limited in scope if "the investigative methods employed [are] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."   *Digiovanni*, 650 F.3d at 507 (internal quotation marks omitted).   Its duration is reasonable if "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."   *Id.* (internal quotation marks omitted).

A routine traffic stop involves requesting license and registration, running a computer check, and issuing a citation.   *United States v. Green*, 740 F.3d 275, 280 (4th Cir. 2014).   The Fourth Circuit has held that an officer may also "in the interest of personal safety" request that the passengers in the vehicle provide identification for criminal record checks, so long as the request does not prolong the seizure.   *United States v. Soriano–Jarquin*, 492 F.3d 495, 500–01 (4th Cir. 2007).   A police officer may question both the driver and passengers regarding matters unrelated to the traffic stop, as long as the unrelated questioning does not extend the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention.   *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010).   So long as the entire time before the search was occupied with traffic stop procedures, the stop does not constitute an unlawful seizure in violation of the Fourth Amendment.   *United States v. Jeffus*, 22 F.3d 554, 557 (4th Cir. 1994).   "Where the extension of a traffic stop is more than de minimus, the officer must have either the driver's consent or a reasonable suspicion, supported by specific and articulable facts, that illegal activity is afoot."   *Branch*, 537 F.3d at 336.   Questioning a driver for a little more than two and a half minutes about ownership of a vehicle and about a driver's travel plans and then a passenger about

10

the purpose of his trip has been deemed a de minimus extension of a traffic stop.   *Mason*, 628 F.3d at 130–31.

The evidence presented at the suppression hearing compels the conclusion that the traffic stop was constitutionally reasonable in both its scope and duration.   In making this finding the Court credits the testimony of Officer Johnson who estimated that the length of the stop—that is, from the time he first pulled Defendant over to the time Johnson issued Defendant a warning citation, returned Defendant's license and other documents to him, and informed him that he was free to go—would have been approximately fifteen minutes.   The Court credits this testimony based on Johnson's demeanor and careful testimony regarding this important fact.   While Officer Johnson did not have an independent recollection of the exact length of the traffic stop, he testified that based on his actions that morning, the stop would have been approximately fifteen minutes. Such testimony, given the passage of nearly three years' time, was carefully and credibly tendered at the suppression hearing.   Further, fifteen minutes was generally consistent with the other credible evidence.

Although the "maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision", there is no persuasive evidence that Officer Johnson's actions during the stop extended the encounter beyond the period reasonably necessary to effectuate the purposes of the lawful detention.   *Mason*, 628 F.3d at 131.   Nor is there any credible evidence that the officers failed to diligently pursue the investigation of the justification for the stop.   *United States v. Guiion–Ortiz*, 660 F.3d 757, 767 (4th Cir. 2011).

Defendant first takes aim at the fact that Johnson ran a warrant check on one of the passengers after Johnson had finished writing the warning citation.   Defendant contends that at

that precise moment the purpose of the traffic stop had concluded, and Johnson should have immediately released Defendant from the stop.   The Court rejects this proposition.   On cross-examination, Officer Johnson stated that after he finished writing Defendant a warning citation, Johnson ran a warrant check on one of the passengers in the van—the passenger who was lying down on a seat in the back of the van.[5]   The record does not show an estimate of the exact amount of time it took Johnson to run this warrant check, but Johnson stated that this type of check is not a lengthy process and only involves entering the subject's date of birth into the computer database.   The record also does not show that Johnson's act of finishing writing the citation necessarily concluded the purposes of the stop.   Assuming for discussion's sake that it did, the record shows that the time it took to complete the additional task of running a warrant check on one of the passengers was a *de minimus* extension.   All told, the stop was approximately fifteen minutes and, based on the totality of the circumstances, this was a reasonable length of time for Officer Johnson to investigate the purpose of the stop.

Defendant also directs the Court's attention to *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011).   He contends that *Digiovanni* is factually similar to the circumstances and, thus, controlling.   In *Digiovanni*, the overall length of the traffic stop was, as here, about fifteen minutes.   But in that case, the police officer did not begin the process of checking Digiovanni's driver's license until over ten minutes after making the initial stop.   The Fourth Circuit affirmed the district court's suppression of evidence because the police officer failed to act with sufficient diligence in pursuing the investigation that gave rise to the initial stop and lacked reasonable

---

[5]   The record does not indicate why Johnson ran a warrant check on this individual.   Johnson did testify that it was an "odd circumstance" for a passenger to remain lying down during a traffic stop.

suspicion that other criminal activity was afoot to prolong the stop. *Id.* at 509–10.

The Court finds that *Digiovanni* is materially distinguishable from the facts of this case. Even if the Court were to credit Defendant's recollection that Johnson's initial questions prior to the license and registration check included questions concerning the presence of firearms and the number and identities of the van's passengers, any such questions that are unrelated to the purposes of the stop but implicate officer safety are part of "the diligence calculus." *Digiovanni*, 650 F.3d at 508 (discussing *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010)).   In *Everett*, the Sixth Circuit stated that questions directed toward officer safety "do not bespeak a lack of diligence."   601 F.3d at 495.   Questions concerning the presence of firearms and the number and identities of passengers implicate officer safety.

Further, the Court credits Johnson's clear and forthright testimony that Johnson did not ask Defendant any drug-related questions until after Johnson returned Defendant's license and paperwork to Defendant and told Defendant he was free to leave.   Thus, the Court rejects Defendant's contention that drug-related questions unrelated to the purposes of the stop prolonged the traffic stop.   Additionally, unlike *Digiovanni*, a case involving a one-person traffic stop, here Officer Johnson was dealing with a traffic stop involving five persons in a van, three of whom were tucked out-of-sight in the rear section of the vehicle.   In addition to presenting additional safety risks, the encounter could reasonably have taken longer than it actually did based on the number of persons in the van because, once Johnson learned that Defendant was driving on a suspended license, he or one of the other officers was required to ascertain if one of the passengers was lawfully licensed to drive the van.   This was additional and necessary work that was not present in *Digiovanni*.   While Defendant's testimony attempted to show that he was kept standing

13

on the side of the road "at least a half-hour" before Johnson issued the traffic citation, the Court declines to credit this testimony because Defendant's self-serving testimony was less persuasive and less clear than Officer Johnson's.   In sum, where the overall length of the stop was approximately fifteen minutes and where any prolongation of the stop during this short interval was reasonable and *de minimus*, the Court finds that the traffic stop was constitutional in scope and duration.

### C.      Defendant's Consent to the Search of his Vehicle was Voluntary

Voluntary consent to search is a well-recognized exception to the Fourth Amendment's warrant requirement.   *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).    "In responding to a defendant's motion to suppress, the Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).   In order for consent to be valid, it must be freely and voluntarily given, rather than merely a "begrudging submission to a command."   *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013).   " 'The existence of consent and the voluntariness of consent are related, but analytically distinct issues.   The Court looks first to whether the defendant's words or conduct could reasonably be interpreted as providing consent. Once the government establishes the defendant's consent, the Court must determine whether that consent was voluntary.' " *United States v. Merritt*, Criminal No. 5:14–CR–07–01, 2014 WL 1660378 at *5 (N.D. W. Va. 2014) (citing *United States v. Harvey*, 901 F. Supp. 2d 681, 692 (N.D. W. Va. 2012) (internal citations omitted)).   In deciding whether consent was knowing and voluntary, a court examines the totality of the circumstances.   *United States v. Mendenhall*, 446 U.S. 544, 557 (1980).   Factors informing a court's analysis include the accused's personal characteristics (e.g.,

14

age, maturity, education, intelligence, and experience) and the circumstances under which the consent was given (e.g. the police officers' conduct, the number of police officers present, and the duration, location, and time of the encounter). *United States v. Elie*, 111 F.3d 1135, 1144 (4th Cir. 1997).

The Court finds by a preponderance of the evidence and based on the totality of the circumstances that Defendant's verbal and written consent to search the van was freely and voluntarily given. Here, the issue is not whether Defendant gave consent to the officers to search his van. Rather, Defendant's argument is that his verbal and written consent to search was not voluntary.

Examination of Defendant's personal characteristics and history supports the Court's finding that Defendant's consent to the search of his van was freely and voluntarily given. Defendant is 43 years old, is married, can read and write, and English is his native language. Defendant has a steady employment history as a residential house and commercial building painter, has no mental or pertinent physical health issues, and, based on his testimony at the suppression hearing, appears to be at least of average intelligence. Notably, Defendant's criminal history reflects arrests and convictions for a variety of offenses. The convictions, which evenly span most of Defendant's adult life, include offenses relating to obstruction of justice, theft, receipt of stolen property, driving under the influence of intoxicants, assault and possession of marijuana, as well as other misdemeanor drug offenses. This lengthy criminal history demonstrates that Defendant is no stranger to criminal procedure and suggests he knew—particularly because of his prior obstruction of justice convictions—how to assert himself in the face of official authority.

15

Thus, Defendant's personal history and characteristics weigh in favor of a finding that his verbal and written consent to search the van was freely and voluntarily given.

The circumstances under which Defendant's consent was given must also be examined. According to Defendant's testimony, there were three police officers present when he was asked for consent to search his van.   Although the presence of three police officers would likely be more intimidating than just one or two officers, the Court does not find based on the totality of the circumstances of the stop that this fact caused Defendant's will to be overborne.   First, the encounter occurred just after 8:30 a.m. on a weekday on the side of a busy interstate highway. Second, Defendant was not a lone motorist; his wife and three other passengers were nearby. Third, there was no credible evidence that any of the officers threatened Defendant by word or gesture or suggested that Defendant or the passengers would be harmed or harassed in any way if Defendant refused to give consent to search.   Where Defendant was standing alongside a public highway that was crowded with morning commuters and where there is no evidence that Defendant was uncooperative or unruly in any way, menacing and intimidating conduct by the officers would be unnecessary, unwise and unlikely.   While Defendant did testify that he felt he had no choice but to consent, that two of the officers were aggressive, and the incident was overwhelming, this testimony is in conflict with other evidence in the record.   There is, however, no evidence aside from Defendant's vague testimony that any of the officers acted aggressively toward him.

Finally, Defendant admitted that prior to giving his consent, Officer Johnson advised him that he was free to leave and had returned his license and other documents to him.   Also, after giving his verbal consent to search, Defendant signed a detailed written consent to search form.

16

Defendant acknowledged on cross-examination that he initialed sections of the form stating that he had the right to refuse to give consent and had the right to withdraw his consent at any time during the search.   Based on all these facts, coupled with Defendant's lengthy experience with the criminal justice system, the Court finds that Defendant's consent to search the van was freely and voluntarily given.

*V.*     *CONCLUSION*

For the foregoing reasons, the Court **DENIES** Defendant's motion to suppress [ECF 21].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        September 8, 2014

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE